#27978-a-SLZ
**2017 S.D. 26**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

SEAN DOREMUS,                                  Petitioner and Appellee,

    v.

COREY GENE MORROW,                             Respondent and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE VINCENT A. FOLEY
Judge

* * * *

PAUL H. LINDE of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota                      Attorneys for petitioner
                                    and appellee.


BENJAMIN L. KLEINJAN of
Helsper, McCarty & Rasmussen, PC
Brookings, South Dakota                        Attorneys for respondent
                                    and appellant.


* * * *

CONSIDERED ON BRIEFS
MARCH 22, 2017
OPINION FILED 05/17/17

#27978

ZINTER, Justice

[¶1.]     Sean Doremus filed a petition requesting a stalking protection order against Corey Morrow. The circuit court conducted an evidentiary hearing, found that Morrow engaged in stalking, and granted the petition. Morrow appeals. We affirm.

*Facts and Procedural History*

[¶2.]     Doremus, a deputy sheriff in Brookings County, filed a petition and affidavit requesting a stalking protection order against Morrow. As is relevant here, Doremus alleged that Morrow: "Willfully, maliciously, and repeatedly followed me"; and "Harassed me by pursuing a knowing and willful course of conduct which seriously alarms, annoys, or harasses me with no legitimate purpose." The circuit court issued a temporary protection order and scheduled a hearing.

[¶3.]     Only Doremus and Morrow appeared at the hearing. Doremus appeared pro se, and Morrow appeared with counsel. Doremus testified that there were three incidents giving rise to his request for a protection order. The first incident occurred in the early morning hours of June 10, 2016. On that occasion, Doremus was assisting the Brookings Police Department in locating the driver of a vehicle who had been in an accident and was eluding law enforcement. While Doremus and other officers were waiting in the area near the accident to see if the driver would return, Morrow drove up but turned around when he saw the police vehicles. Doremus then initiated an investigatory stop of Morrow's vehicle. Although Morrow did not appear to be under the influence of alcohol, Doremus

believed that Morrow was under the influence of drugs. Doremus arrested Morrow for driving under the influence and required that he take a blood test.

[¶4.] During the course of the blood draw, Morrow made statements to Doremus that caused him concern. Doremus testified that the way Morrow "word[ed] things and the manner he [did] so . . . [came] across as a threat," made "things very uncomfortable," and "instill[ed] fear." Doremus explained:

> [Morrow] stated that when we were done with this whole thing that he would find me, that we would have a conversation. He was very methodical in how he worded things in the aspect that he pushes the borderline of threatening law enforcement, but pulls it back and just puts a smile on and will—like I said, he'll state that we're going to have a conversation and when you ask him to go in depth he'll say: Don't worry about it, we're just going to have a little conversation, things along those lines.

Later that morning, Doremus was driving near the jail just after Morrow was released on bond.[1] Morrow blocked the road and demanded that Doremus give him a ride home or else he would cause problems for the police department. However, Morrow ran off when another deputy arrived.

[¶5.] The second incident occurred approximately two months later. On this occasion, Doremus, who was off duty, encountered Morrow at a grocery store. Doremus testified that Morrow stared at him, walked up very close, and always stayed within one aisle of him while they were in the store. Later, when Doremus was putting groceries in his car, Morrow drove up behind Doremus and said that he knew Doremus from somewhere and that it was "not good." Doremus testified that Morrow then smiled and took a picture of Doremus putting his groceries in his car.

---

1. The charges were dismissed before Morrow's initial appearance.

Morrow also took a picture of Doremus's license plate. As Doremus left the parking lot, he observed that Morrow had parked in a parking lot across the street. Doremus testified that Morrow appeared to be waiting for Doremus as he left. After this incident, Doremus filed a harassment report with the Brookings Police Department.

[¶6.]     The third incident occurred a few days later at 2:15 a.m. while Doremus was on patrol. Morrow drove up next to Doremus at a red light and was again staring at Doremus. When the light turned green, Doremus proceeded straight, and Morrow turned south. After driving his patrol vehicle for approximately thirteen blocks, Doremus initiated an unrelated traffic stop and radioed his location to the dispatcher. Shortly thereafter, he observed Morrow's vehicle park two blocks north of the traffic stop. Morrow got out of his vehicle and began walking toward Doremus. Doremus then radioed for other officers to assist him. Right after Doremus radioed for assistance, Morrow walked back to his vehicle and left. Doremus testified that Morrow had a "police-scanner app" on his cell phone that could be used to listen to law enforcement radio traffic.

[¶7.]     Morrow's version of these incidents differed only slightly. He admitted that they occurred: his only dispute concerned his purpose and reason for the encounters and statements. With respect to the night of Morrow's arrest, he denied any threatening intent when he said he was going to have "a conversation" with Doremus. Morrow also claimed that he did not recognize Doremus when Morrow approached Doremus in the street after being released from jail. Regarding the grocery-store encounter, Morrow testified that he thought Doremus was a high-

school classmate that did not like Morrow. He said that he pulled up to Doremus in the parking lot to clarify whether Doremus was his classmate. Morrow also denied taking any photographs. Finally, with respect to the traffic-stop incident, Morrow—whose address was southeast of where the traffic stop occurred—claimed that the encounter was inadvertent and coincidental. However, his explanation was nonsensical. He first testified that after seeing Doremus's police vehicle, he decided to take a different route home to avoid getting pulled over. He then testified that once he saw flashing police lights, he decided to drive past the traffic stop because he did not know if someone was pulled over, even though the location of the stop was off the route he was supposedly going. He testified that he then circled the block and parked his vehicle because he was "afraid that [Doremus] was going to approach" him and pull him over again. He did not explain why he parked his car north of the traffic stop. Morrow also admitted that he had a police-scanner app on his cell phone but claimed that he used it "[m]ostly for weather."

[¶8.] After hearing all the evidence, the circuit court rejected Morrow's claims of coincidence and legitimate purpose and issued a protection order. The court entered oral findings of fact supporting the order. The court stated:

> I'm going to find and grant the order that there was the willful, malicious, and repeated following and included [sic] the attempt to vex or annoy the petitioner and included—and there was also willful, malicious, and repeated harassing because you [Morrow] were knowingly and willfully engaging in the course of conduct which included a series of acts and continuity of purpose that was directed at him, the petitioner, and served no legitimate purpose and obviously was an annoyance, if not even worse, seriously alarming.

The court also entered written findings on a form containing check boxes.[2] Those findings confirmed each of the elements of stalking.[3] The court also handwrote the reason it rejected Morrow's explanation of the encounters. The court found that: "Respondent lacked credibility due to his statement regarding the identity of the Petitioner [at the grocery store because] the age difference was readily apparent,[4] and the pull up behind the other lacked a coherent rationale." Morrow appeals.

*Decision*

[¶9.]        When reviewing the grant or denial of a protection order, we first review "the circuit court's findings of fact under the clearly erroneous standard." *Erickson v. Earley*, 2016 S.D. 37, ¶ 8, 878 N.W.2d 631, 633. We then determine whether the court abused its discretion when it granted or denied the protection order. *Id.* ¶ 8, 878 N.W.2d at 634. Morrow, however, argues that the circuit court's

---

2.        In its written order, the circuit court checked a box finding that Morrow waived "further hearing, findings of fact, and conclusions of law" and that he stipulated "to the entry of an Order of Protection." Doremus concedes that the court erroneously checked this box, as the court entered written findings of fact and conclusions of law, and there is nothing in the record to suggest that Morrow stipulated to the entry of the protection order.

3.        The circuit court's written findings included findings that Morrow "stalked in accordance with SDCL 22-19A-1 by: . . . [w]illfully, maliciously, and repeatedly following" Doremus and that Morrow intentionally did so to "vex, annoy, or injure" Doremus. The court also found that Morrow "[w]illfully, maliciously, and repeatedly harassed" Doremus because Morrow:
   - "knowingly and willfully engaged in the harassing course of conduct";
   - "[t]he course of conduct composed of a series of acts over a period of time evidencing a continuity of purpose";
   - Morrow's "harassing was directed at" Doremus;
   - Morrow "seriously alarmed, annoyed, ~~or harassed~~" Doremus; and
   - the "course of conduct served no legitimate purpose."

4.        Morrow is approximately seventeen years older than Doremus.

oral and written findings are insufficient to permit meaningful review. He contends that the court did not adequately explain how his conduct met the elements of stalking.

[¶10.]    "It is well-settled law that it is the trial court's duty to make required findings of fact, and the failure to do so constitutes reversible error." *Repp v. Van Someren*, 2015 S.D. 53, ¶ 10, 866 N.W.2d 122, 126. We cannot meaningfully review a court's decision to enter a stalking protection order "without the trial court's reasons for ruling the way it did." *Id.* We have reversed protection orders when the circuit court failed to indicate which parties' version of the facts it believed and when the court made only a general statement that stalking or domestic abuse occurred. *Id.* ¶ 11 ("Without resolving the numerous factual conflicts in this case or weighing the credibility of Repp and Van Someren's testimony, it is not apparent how the evidence meets either definition of stalking."); *Shroyer v. Fanning*, 2010 S.D. 22, ¶ 8, 780 N.W.2d 467, 470; *Goeden v. Daum*, 2003 S.D. 91, ¶ 8, 668 N.W.2d 108, 111. We have also reversed protection orders when the circuit court's findings did not correspond with the testimony at trial, and therefore, there were no findings or evidence to support the order that was entered. *See March v. Thursby*, 2011 S.D. 73, ¶¶ 19-20, 806 N.W.2d 239, 244 (reversing protection order because the court's findings indicated it found that "physical injury resulting from an assault or crime of violence" occurred even though the evidence only supported a theory of stalking). Ultimately, the question is whether the circuit court's findings sufficiently address the facts of the case under the specific elements of stalking at

issue such that we may determine whether "the evidence met the statutory elements of stalking." *See Repp*, 2015 S.D. 53, ¶ 11, 866 N.W.2d at 126.

[¶11.]    We acknowledge that some of the circuit court's written and oral findings in the present case are conclusory—they merely parrot statutory text. But under the facts of this case, they are sufficient to allow us to meaningfully review the court's decision to enter the stalking protection order against Morrow. The findings are sufficient first because there was little dispute about what had occurred: the only material dispute concerned Morrow's intent and purpose for his repeated encounters with Doremus. As Morrow indicates in his brief, "Other than Mr. Morrow's motivations, innocent versus malicious, the factual narratives on the material facts match up quite closely." Second, on the only issue in dispute (Morrow's motivation and purpose), the circuit court specifically rejected Morrow's claim of coincidence and legitimate purpose in its oral and written findings indicating that Morrow's claims were not credible. Third, the court did not merely restate the stalking statute's broad language. The court entered oral and written findings on each applicable, specific sub-element of stalking in SDCL 22-19A-1(1), SDCL 22-19A-4, and SDCL 22-19A-5. Consequently, unlike *Repp*, *Shroyer*, and *Goeden*, the findings here are sufficient: the circuit court stated which version of events it believed; it specifically identified which relevant elements of stalking were satisfied; and ultimately, it is evident "how the evidence [met] the statutory elements." *See Repp*, 2015 S.D. 53, ¶ 11, 866 N.W.2d at 126.

[¶12.]    We next address Morrow's implied claim that the court's findings were clearly erroneous. The court found that Morrow "[w]illfully, maliciously, and

repeatedly" followed Doremus to "vex, annoy, or injure him"; and that Morrow "[w]illfully, maliciously, and repeatedly harassed" Doremus. "Harass" is defined as "a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose." SDCL 22-19A-4. "Course of conduct" is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." SDCL 22-19A-5.

[¶13.] The evidence supports the circuit court's findings. The evidence suggests that Morrow was upset because Doremus arrested him for DUI and that Morrow's statements were intended as an equivocal threat of future retaliation against Doremus. Morrow also displayed bizarre behavior in flagging down Doremus in the street and running off. Two months later, Morrow followed Doremus in a grocery store, drove up behind Doremus in the parking lot, took pictures of Doremus and his license plate, and then stopped at a location where Morrow could watch Doremus's departure. A few days later, Morrow drove up to Doremus at an intersection at 2:15 a.m. Moments later, when Doremus was engaged in an unrelated traffic stop thirteen blocks away, Morrow approached Doremus on foot but disappeared when Doremus radioed for backup. Morrow's possession of a police-scanner app on his phone suggested that the encounter was more than mere coincidence. The nature of these repeated encounters supports the court's findings that Morrow willfully, maliciously, and repeatedly followed and harassed Doremus. The court did not clearly err in finding that stalking occurred.

[¶14.]     Finally, Morrow argues that he engaged in constitutionally protected conduct that was not prohibited by stalking statutes.  *See* SDCL 22-19A-5.  He claims that the First Amendment "absolutely allows private citizens such as Mr. Morrow to smirk, smile, stare at, photograph, videotape or otherwise observe police officers such as Deputy Doremus in the course of his public duties."  Morrow did not present this constitutional argument to the circuit court, and he did not object to the court's findings and conclusions on that basis.  Therefore, other than noting the factual inconsistency of Morrow's description of his own conduct in making this argument, we decline to consider it.  *See Boever v. S.D. Bd. of Accountancy*, 526 N.W.2d 747, 750-51 (S.D. 1995).

[¶15.]     The circuit court's findings of fact are sufficient to permit appellate review, they are not clearly erroneous, and the court did not abuse its discretion in issuing the protection order.  We affirm.

[¶16.]     GILBERTSON, Chief Justice, and SEVERSON, WILBUR, and KERN, Justices, concur.